[No. A030416. First Dist., Div. Three. Sept. 19, 1986.]

KIRSCHNER BROTHERS OIL, INC., et al.,
Plaintiffs and Appellants, v.
NATOMAS COMPANY et al., Defendants and Respondents.

[No. A029167. First Dist., Div. Three. Sept. 19, 1986.]

DAVID R. KOTOK et al., Plaintiffs and Appellants, v.
NATOMAS COMPANY et al., Defendants and Respondents.

COUNSEL

David B. Gold, Paul F. Bennett, Solomon B. Cera, Barrack, Rodos & Bacine, Leonard Barrack, Gerald Rodos, Saul, Ewing, Remick & Saul, J. Dennis Faucher and Kevin R. Reitz for Plaintiffs and Appellants.

Melvin R. Goldman, David G. Robertson, Vincent J. Chiarello, Morrison & Foerster, James K. Haynes, Ronald Hayes Malone, Barbara Moses and Orrick, Herrington & Sutcliffe for Defendants and Respondents.

OPINION

SCOTT, J.—Plaintiffs, all holders of Natomas Company (Natomas) preferred stock, filed similar actions against Natomas, one of its directors, and Diamond Shamrock Corporation. Plaintiffs sought to enjoin a proposed merger, as well as damages for breach of fiduciary duty. After a preliminary injunction was denied, the merger or reorganization was effected. According to its terms, each share of Natomas preferred was exchanged for a share of the preferred stock of another corporation, New Diamond. Subsequently summary judgment was entered in favor of defendants. Plaintiffs, now all former Natomas preferred shareholders, have appealed. The merger triggered several lawsuits, and this is the third such case which this court has recently considered.

I

Natomas is a California corporation. In 1980, 2.5 million Natomas $4 "Series C" cumulative convertible preferred shares were issued. The rights of the preferred shareholders were specified in a certificate of determination issued by the Natomas board of directors.

In May 1983, Diamond Shamrock Corporation, through a wholly owned subsidiary, commenced a hostile tender offer for Natomas common stock and stated its intention to propose a merger between Natomas and the subsidiary. Shortly thereafter, the boards of Diamond Shamrock and Natomas approved a plan and agreement of reorganization between the two companies, and the tender offer was terminated.

According to the plan, a new holding company, New Diamond, was to be formed, which in turn would form two wholly owned subsidiaries, D Sub,

Inc., and N Sub, Inc. In two reverse triangular "phantom" mergers,[1] D Sub, Inc., would merge into Diamond Shamrock, and N Sub, Inc., into Natomas; New Diamond would issue New Diamond common shares to common shareholders of Natomas and Diamond Shamrock in exchange for their shares. New Diamond would thus become the sole shareholder of Natomas' common shares.

Before the merger of N Sub, Inc., into Natomas, the latter was to spin off or distribute to its common shareholders the common shares of American President Companies, Ltd. (APC), which held the shares of Natomas' real estate and transportation subsidiaries.

The agreement was to be submitted to Natomas common and preferred shareholders, voting as separate classes. Upon the approval of each class, the Natomas common shares would be converted into New Diamond common shares and the Natomas preferred into New Diamond preferred, convertible into New Diamond common. Failure to obtain the approval of the Natomas preferred shareholders would not prevent consummation of the merger, however, and it is that feature of the reorganization plan which is at the heart of this litigation. If a majority of Natomas common shareholders approved the agreement but its preferred shareholders did not, the reorganization would still take place. The Natomas common shares would be converted into New Diamond common, but the Natomas preferred would remain outstanding and continue to be convertible into Natomas common.

Between the date of the initial hostile tender offer by Diamond Shamrock and the announcement of the reorganization agreement, Kirschner Brothers Oil, Inc., and others (the Kirschner plaintiffs) purchased 6,000 Natomas preferred shares. (*Insurance Underwriters Clearing House, Inc.* v. *Natomas Co.* (1986) 184 Cal.App.3d 1520, 1523 [228 Cal.Rptr. 449].) On July 8, 1983, the Kirschner plaintiffs filed a class action against Natomas, its president and chief executive officer, Dorman L. Commons, and Diamond Shamrock, seeking damages and an order enjoining the proposed reorganization. Among their allegations was that consummation of the merger without an affirmative vote of a majority of the preferred shareholders would violate Corporations Code section 1201[2] and the certificate of determination specifying the rights of Natomas preferred shareholders; they also alleged a breach of the fiduciary duty owed by Natomas and Dorman L. Commons to the preferred shareholders. A similar complaint was filed by David R.

---

[1]See 2 Marsh's California Corporation Law (2d ed.) sections 18.3, 18.9, 18.20, pages 482, 493, 516, for a discussion of reverse transactions, triangular and triangular phantom mergers generally, and this transaction in particular.

[2]All statutory references are to the Corporations Code unless otherwise indicated.

Kotok and the Cumberland Growth Fund, Inc., other holders of Natomas preferred shares.

The actions were consolidated and on August 1, 1983, in a written opinion, the trial court denied a preliminary injunction. On August 30, 1983, at a special meeting of Natomas common and preferred shareholders, a majority of each class of shareholders voted to approve the reorganization plan which provided for the conversion of Natomas common shares into New Diamond common and Natomas preferred into New Diamond preferred, and the mergers were carried out. In mid-1984, defendants' motions for summary judgment were granted and judgments were entered in their favor.[3] Both groups of plaintiffs appealed, and their appeals have been consolidated in this court.

## II

Plaintiffs contend the trial court erred in granting summary judgment. Plaintiffs urge that as a matter of law defendants breached their fiduciary duty by denying the preferred shareholders their statutory right to vote on the merger and by depriving them of voting and other rights granted under the certificate of determination. Plaintiffs also argue that triable issues of fact exist as to whether defendants breached their fiduciary obligation by structuring the reorganization agreement so that the preferred shareholders could not prevent the merger, and by engaging in self-dealing at the expense of the preferred shareholders.[4]

■ The principles governing summary judgment are well-settled. "Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. [Citations.]" (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) The affidavits of the moving party are strictly construed, whereas those of the party opposing the motion are liberally construed. Doubts as to the propriety of granting summary judgment must be resolved in favor of the opponent of the motion. (*Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 874 [191 Cal.Rptr. 619, 663 P.2d 177].) But if there

[3]One needs a scorecard to keep track of the corporate name changes in this case. After the reorganization, Diamond Shamrock Corporation changed its name to Diamond Chemicals Company, but will be referred to as Diamond Shamrock in this opinion. New Diamond, the holding company, changed its name to Diamond Shamrock Corporation, but will be referred to in this opinion as New Diamond.

[4]Defendant Commons, as a member of Natomas' board of directors, bore a fiduciary relationship to Natomas and to all its stockholders. (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 31 [216 Cal.Rptr. 130, 702 P.2d 212].) However, plaintiffs fail to articulate clearly the theory upon which they base their claim that Diamond Shamrock owed a fiduciary duty to the preferred shareholders of Natomas.

are no material issues of fact and the declarations establish that defendant is entitled to judgment as a matter of law, summary judgment should be granted. (*Becker* v. *IRM Corp*. (1985) 38 Cal.3d 454, 471 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601].)

■ While breach of fiduciary duty is a question of fact (*Tenzer* v. *Superscope, Inc., supra,* 39 Cal.3d at p. 32), the existence of legal duty in the first instance and its scope are questions of law. (See, e.g., *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 115 [81 Cal.Rptr. 592, 460 P.2d 464] [when no public market for shares exists, fiduciary duty of controlling shareholders to minority shareholders includes obligation not to use majority's power to control the corporation "for the purpose of promoting a marketing scheme that benefits themselves alone to the detriment of the minority"]; *Brown* v. *Halbert* (1969) 271 Cal.App.2d 252, 272 [76 Cal.Rptr. 781, 38 A.L.R.3d 718] [duty of majority stockholder-director, when contemplating sale of majority stock at price not available to other stockholders and when sale may prejudice the minority, is to act affirmatively with full disclosure so that minority shareholders may have opportunity to obtain substantially same advantages]; see also *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750-758 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701] [defining scope of duty in tort action].)

a.

We consider plaintiffs' first contention that defendants breached their fiduciary duties by abridging the preferred shareholders' statutory right under section 1201, subdivision (a), to vote on the Natomas merger.

■ The Corporations Code recognizes several methods of reorganization whereby two or more corporations are combined into a single business enterprise. (§ 181; 2 Marsh's Cal. Corporation Law, *supra,* § 18.1-18.15, pp. 478-507.) Section 1201 spells out when a vote by the shareholders of any corporation involved in a reorganization is required. Subdivision (a) of section 1201 provides in pertinent part: "The principal terms of a reorganization shall be approved by the outstanding shares . . . of each class of each corporation the approval of whose board is required under Section 1200 . . . except that (unless otherwise provided in the articles) *no approval of any class of outstanding preferred shares of the surviving or acquiring corporation or parent party shall be required if the rights, preferences, privileges and restrictions granted to or imposed upon such class of shares remain unchanged . . . .*" (Italics added.)

Plaintiffs contend that despite the appearance of the transaction at issue, in reality Natomas was acquired by Diamond Shamrock. Therefore, plaintiffs

reason, Natomas was not a "surviving corporation" under either reorganization alternative and the preferred shareholders' approval was required by section 1201, subdivision (a), for either to become effective.

Ignoring for the moment the fact that a majority of the preferred shareholders *did* approve the reorganization,[5] we consider the argument unpersuasive. The reorganization at issue here was structured as a "reverse triangular 'phantom' merger," well-recognized as a method of reorganization which preserves the existing corporate entity of the target corporation. (See 2 Marsh's Cal. Corporation Law, *supra,* § 18.9, pp. 493-496; 1A Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1985) §§ 252.03 & 253.01, pp. 12-9–12-10, 12-13–12-14.) Notwithstanding the fact that the parent holding company, New Diamond, would wholly own Natomas, it is still undisputed that N Sub, Inc., corporation merged *into* Natomas, leaving the latter intact as a legal entity. Similarly, D Sub, Inc., merged into Diamond Shamrock, which also remained a legal entity. The Corporations Code defines a "surviving corporation" simply as "a corporation into which one or more other corporations are merged." (§ 190.) In another case which arose out of this same corporate reorganization, *Gaillard* v. *Natomas Co.* (1985) 173 Cal.App.3d 410 [219 Cal.Rptr. 74], this court has already recognized the continued existence of Natomas after the reorganization. (*Id.,* at p. 421.)

■ In a related argument, plaintiffs contend the reorganization violated their voting rights under the certificate of determination. In particular, plaintiffs focus on the tenth paragraph of the certificate, which provides in pertinent part: "[E]xcept as otherwise expressly required by law, the Series C Preferred Shares shall have voting rights except as set forth below:

"(a) So long as any of the Series C Preferred Shares are outstanding, the consent of the holders of at least a majority of the then outstanding

[5]An action which involves only abstract or academic questions of law cannot be maintained, and an action originally based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 517, p. 499.)

Defendant Diamond Shamrock argues that the case should be dismissed as moot. Defendant reasons that because the preferred shareholders *did* approve the reorganization, any argument that reorganization could not have been accomplished lawfully without their approval is moot.

In their reply brief, plaintiffs say that the mootness argument is "ludicrous," primarily because it overlooks their "substantial" damage claims. Plaintiffs' theories as to how they have been damaged by the exchange of their Natomas preferred for New Diamond preferred are ambiguous and vague. Nevertheless, given those claims, and in light of plaintiffs' belated suggestion at oral argument that rescission might be sought, we decline to dismiss the appeal as moot.

Preferred Shares . . . shall be necessary to permit, effect or validate any one or more of the following:

"(i) . . . . . . . . . . . . . . . . . . . . . . . . .

"(ii) . . . the consolidation or merger of the Company into any other corporation, . . . unless each holder of Preferred Shares immediately preceding such consolidation or merger shall receive the same number of shares, with substantially the same rights and preferences, of the resulting corporations . . . ."

Plaintiffs argue that this provision gave them the right to vote on either reorganization plan, but the provision is inapplicable. It applies on its face to a merger of Natomas *into* another company. As has been discussed, that did not occur here.

### b.

Plaintiffs also contend that even if Natomas was a surviving corporation, their vote was required under section 1201, subdivision (a), because their rights were being changed. They argue that the reorganization plan unlawfully deprived them of rights guaranteed by the certificate of determination under which their preferred shares were issued. As we understand this contention, it is identical to that unsuccessfully urged below in support of the motion for preliminary injunction. There, plaintiffs argued that the second alternative proposal, which would have permitted merger without their vote and left them with Natomas preferred, would have adversely affected their right to a public market for Natomas common and preferred shares. In other words, under that alternative, the preferred's rights, preferences and privileges would not have remained unchanged; thus reorganization under that alternative without their vote would have violated section 1201, subdivision (a).

The trial court rejected the argument that the preferred had a right to a public market for their shares and denied the injunction. Thereafter, as already discussed, a majority of both the common and preferred shareholders voted to approve the plan which gave them New Diamond shares for their shares. On appeal, if this "right to a public market" argument survives even though the preferred shareholders voted to approve the reorganization, it does so because plaintiffs now argue that their affirmative vote was unlawfully coerced. Plaintiffs insist that the preferred had no real choice but to approve the merger. Plaintiffs reason that the reorganization plan made it economically unfeasible for the preferred shareholders to remain as shareholders of Natomas because as a practical matter the conversion

value and marketability of their Natomas shares would vanish with the merger. The preferred shareholders were thus forced to approve the reorganization and accept the alternative which granted them preferred shares in New Diamond.

Plaintiffs' rights and privileges argument before the trial court rested on the premise that, as preferred shareholders, they had a right to the continued existence of a public market for their shares, but no authority cited then or now supports that proposition, and *Kessler* v. *General Cable Corp.* (1979) 92 Cal.App.3d 531 [155 Cal.Rptr. 94] holds otherwise. Plaintiff in *Kessler* acquired $10,000 in convertible debentures issued by Sprague Corporation. Later, General Cable Corporation acquired over 95 percent of Sprague's common stock. As a result, that stock and the convertible debentures were delisted on the New York Stock Exchange. Plaintiff filed an action for damages against Sprague, General Cable, and others. As against Sprague, plaintiff alleged that its prospectus offering the debentures declared that application had been made for a New York Stock Exchange listing. Plaintiff interpreted that declaration as an implied promise that the debentures, once listed, would continue to be listed, apparently indefinitely.

The appellate court held that the complaint failed to allege facts constituting a cause of action. The court stated in part that the brief reference to the listing did not constitute a continuing promise to avoid delisting, for whatever reason, for the 25-year life of the debentures, and that no reasonable investor would have so interpreted that statement. In addition, in language relevant to the instant case, the court also held that California law did not mandate that a corporation must maintain a particular public market for its shareholders or debenture holders. (*Id.,* at pp. 542-543.)

It is true that the facts of *Kessler* are not identical to those at issue in this case. Nevertheless, we consider its reasoning persuasive, and conclude that plaintiffs had no absolute right under California law or under the certificate of determination to the continued existence of a public market for their Natomas preferred shares. As plaintiffs' claim to that right is the premise upon which their coercion argument is based, that argument must fail.

c.

Plaintiffs argue for the first time on appeal that their vote on the reorganization plan was also required by section 1201, subdivision (d). In pertinent part, that subdivision mandates approval of a merger by shareholders who will receive shares having "different rights" than those surrendered. Shares in a foreign corporation received in exchange for shares

in a domestic corporation have "different rights" within the meaning of that subdivision.

What plaintiffs' argument ignores, of course, is that whether or not subdivision (d) of section 1201 was applicable to the reorganization at issue, the preferred shareholders *did* approve the plan which gave them foreign (i.e., New Diamond) preferred in exchange for their shares. The alternative plan, under which merger would have taken place without their affirmative vote, did not violate subdivision (d), as under that plan the preferred would have kept their shares of the California corporation.

### III

Plaintiffs contend that there is a triable issue of fact as to whether defendants breached their fiduciary duty to the preferred shareholders by structuring the merger to the detriment of those shareholders and by "negotiating for themselves" while failing to protect or enhance the interests of those shareholders.

In support of this contention, plaintiffs focus primarily on *Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93. Although the issue in *Ahmanson* was the fiduciary duty of majority to minority shareholders, the court also spoke in strong language of a director's fiduciary duty. It cautioned that a director must not use his power for his personal advantage and to the detriment of the stockholders no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. (*Id.,* at pp. 108-109.) Relying on *Ahmanson,* plaintiffs urge that in negotiating the reorganization, defendants did not protect the interests and rights of the preferred shareholders.

As has been stated earlier in this opinion, the existence of legal duty and its scope are questions of law. *Ahmanson* is instructive on this principle. Plaintiff in *Ahmanson,* a minority shareholder of a corporation, brought an action seeking damages for breach of fiduciary duty allegedly owed by the majority to the minority shareholders. The Supreme Court held that her complaint was sufficient to state a cause of action.

First, the court rejected the argument that absent reliance on inside information, use of corporate assets, or fraud, majority shareholders owe no fiduciary obligation to other shareholders. ■ In this state, the court declared, ". . . the fiduciary obligations of directors and shareholders are neither limited to specific statutory duties and avoidance of fraudulent practices nor are they owed solely to the corporation to the exclusion of other shareholders." (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 109,

citing *Remillard Brick Co.* v. *Remillard-Dandini Co.* (1952) 109 Cal.App.2d 405 [155 Cal.Rptr. 94].) The California rule is a "comprehensive rule of 'inherent fairness'" which "applies alike to officers, directors, and controlling shareholders in the exercise of powers that are theirs by virtue of their position. . . ." (*Ahmanson, supra,* at p. 110.)

Next, holding that the complaint stated a cause of action, the court spoke more precisely about the parameters of the duty of majority shareholders in the context of the facts alleged. "[W]e do not suggest that the duties of corporate fiduciaries include in all cases an obligation to make a market for and to facilitate public trading in the stock of the corporation. But when, as here, no market exists, the controlling shareholders may not use their power to control the corporation for the purpose of promoting a marketing scheme that benefits themselves alone to the detriment of the minority." (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 115.)

In this case, relying on the sweep of the court's language in *Ahmanson,* plaintiffs argue that defendants' fiduciary duties were broader than their contractual and statutory obligations to the preferred shareholders. Nevertheless, what plaintiffs overlook is that after discussing the rule of inherent fairness in general terms, the *Ahmanson* court carefully related that rule to the facts alleged. Plaintiffs in this case ignore that step. They fail to explain with any specificity what they, as preferred shareholders, might have been entitled to that they did not receive, or how defendants violated the rule of "inherent fairness." Nor do they address the obligations owed by the directors to the common shareholders under the facts involved here.

■ Preferred shares are those which have a preference over other shares either as to distribution of assets on liquidation or as to payment of dividends, or some other combination of rights, preferences, privileges, and restrictions. (1 Marsh's Cal. Corporation Law, *supra,* §§ 5.3-5.6, pp. 207-214.9.) "Since the relation between the holders of preferred stock and the corporation is contractual, the extent of their right to share in the corporate profits and of their preference over common stockholders depends upon the terms of their contract." (12 Fletcher, Cyclopedia of Corporations (rev. ed. 1985) Stocks and Stockholders, § 5443, p. 154, fns. omitted; see *Rothschild Intern. Corp.* v. *Liggett Group* (Del. 1984) 474 A.2d 133, 136; *Wood* v. *Coastal States Gas Corp.* (Del. 1979) 401 A.2d 932, 937; *In re Olympic National Agencies, Inc.* (1968) 74 Wn.2d 1 [442 P.2d 246, 248].) In this state, the articles of incorporation and the certificate of determination define the rights, preferences, and privileges granted to preferred shareholders. (§§ 401, 203, 154; 1 Ballantine & Sterling, Cal. Corporation Laws, *supra,* § 127.03, at pp. 7-50.)

Preferred shares have been described as "a distinctive and often unsatisfactory security. They have been compared to debt securities, since practically they represent only a preferential claim to a specified rate of return and return of capital . . . rather than a meaningful ownership interest . . . ." (1 Ballantine & Sterling, Cal. Corporation Laws, *supra*, § 127.03 at p. 7-50, fn. omitted.) Another commentator notes that holders of common stock "can object to and prevent any arrangement or transaction entered into or threatened by the company for the purpose of putting the preferred stockholders on a more favorable footing than is secured to them by their contract." (11 Fletcher, Cyclopedia of Corporations (rev. ed. 1986) Stocks and Stockholders, § 5305, p. 679, fn. omitted.)

As defendants point out, courts in other jurisdictions have generally rejected the claims of preferred shareholders to rights and preferences other than those defined or necessarily implied in their contract. For example, in *Wood* v. *Coastal States Gas Corp.*, *supra*, 401 A.2d 932, among the provisions of a complex plan settling certain litigation was the distribution of stock in one corporation to the common shareholders of Coastal Corporation. Coastal's preferred shareholders argued, inter alia, that the plan violated their conversion rights as set forth in the certificate and unjustly enriched the common shareholders at the expense of the preferred. Noting that for most purposes, the rights of preferred shareholders as against common are fixed by the contractual terms agreed upon when the class of preferred stock was created, the appellate court analyzed the terms of that contract and concluded that its terms would not be violated by the settlement. The unjust enrichment argument was also rejected on the ground that because the contract was a measure of the preferred's rights, there could be no recovery under an unjust enrichment theory independent of the contract. (*Id.*, at p. 942.)

In *In re Olympic National Agencies, Inc.*, *supra*, 442 P.2d 246, the trial court directed a distribution of the assets of a dissolving corporation to the common and preferred stockholders on a pro rata basis, after the preference of the preferred stock was satisfied. The appellate court reversed, relying on the general rule that when the articles of incorporation grant a class of stock a preference, this preference is presumed to be exhaustive of that stock's rights. (*Id.*, at pp. 247-250.)

In *Broad* v. *Rockwell Intern. Corp.* (5th Cir. 1981) 642 F.2d 929, the court considered the rights of the holders of convertible debentures rather than those of preferred shareholders, but the case is instructive because the rights of debenture holders are also primarily a matter of contract. (*Id.*, at pp. 940-941.) After Rockwell acquired Collins in a cash merger, the holders of Collins convertible debentures brought an action alleging that the two

corporations, among others, breached the terms of the indenture which spelled out the conversion rights of debenture holders and also breached fiduciary duties owed them. The heart of the dispute was a proposed supplemental indenture, to be issued by Rockwell as successor to Collins' obligations, providing each debenture holder with the right to convert to the cash value of the Collins common shares immediately before the merger.

The appellate court rejected the breach of contract claim, concluding that the proposal complied with the terms of the indenture. (*Id.*, at pp. 951-957.) The court then assumed without deciding that Rockwell had a fiduciary duty to the debenture holders but held that there was no need for a jury to consider the question of breach. Because Rockwell had fully complied with its obligations under the indenture, as a matter of law it could have no liability for breach of fiduciary duty. (*Id.*, at pp. 958-960.)

Very recently, in *Revlon, Inc.* v. *MacAndrews & Forbes Holdings* (Del. 1986) 506 A.2d 173, the Delaware Supreme Court held that a board of directors breached its fiduciary duty of loyalty to equity shareholders by affording noteholders rights beyond those fixed by their contracts. In that case, as part of their effort to thwart a hostile takeover by Pantry Pride, the board of directors of Revlon, Inc., issued subordinated notes containing covenants restricting Revlon's ability to incur additional debt and other limitations. The Revlon board then agreed to a buyout by Forstmann Little & Co. Among the terms of the buyout agreement was a waiver of the covenants in the notes, which caused their market value to drop. After the irate noteholders threatened to sue, the terms of the buyout were renegotiated. Forstmann agreed to support the par value of the notes, by an exchange of new notes. The Delaware Supreme Court upheld a preliminary injunction against the transaction, in part because the agreement to protect the noteholders was inconsistent with the Revlon board's duty to its equity shareholders to maximize the sale price of the company. The court emphasized that the note contracts permitted waiver of the covenants; thus the holders' acceptance of the notes included the acceptance of the risk of an adverse market if waiver occurred. (*Id.*, at pp. 182-183.)

In light of the foregoing authority, we conclude that in this case, the fiduciary duty of the directors of Natomas did not include the obligation to negotiate or structure the reorganization such that the preferred shareholders would receive rights and privileges in excess of their entitlement under the certificate of determination.[6]

---

[6]Whether the directors breached their fiduciary duties by negotiating, approving, and recommending the "golden parachute" agreements and other benefits provided for certain officers and directors as part of the merger agreement is being contested in a shareholder's

Plaintiffs cite no authority, California or otherwise, which supports their nebulous theory on the scope of the directors' fiduciary duties to preferred shareholders. *Green* v. *Hamilton Intern. Corp.* (S.D.N.Y. 1977) 437 F.Supp. 723, upon which plaintiffs rely, is inapposite. In *Green,* after redeeming certain convertible debentures of Hamilton International Corporation (HIC), plaintiffs brought an action alleging HIC violated federal securities laws and committed common law fraud by concealing merger negotiations until after the redemption. Plaintiffs alleged they were thereby deprived of the opportunity to convert their debentures into stock and participate profitably in the merger rather than redeem. The district court held that the complaint stated causes of action. (*Id.,* at pp. 727-729.) In a footnote, it added that if the facts were as alleged, a breach of fiduciary duty may have occurred. It reasoned that the holder of a convertible debenture relies on the opportunity to make a "proper" (i.e., profitable conversion on due notice), and implied that HIC had a duty not to defeat that reasonable expectation by knowingly providing inaccurate information. (*Id.,* at p. 729, fn. 4.) The case neither involves nor resolves the scope of fiduciary duty question presented in this case.

Plaintiffs also cite *Pittsburgh Terminal Corp.* v. *Baltimore & O. R. Co.* (3d Cir. 1982) 680 F.2d 933. In that case the court held that under Maryland law the scope of the fiduciary duty of controlling shareholders and directors to holders of convertible debentures encompassed the duty to give notice of information which the latter need to receive the benefits of their conversion option, should they choose to exercise it. Breach of that duty would give rise to a cause of action for fraud under section 10(b) of the federal Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b)). (*Pittsburg Terminal Corp., supra,* 680 F.2d at pp. 940-942.) The case does not involve a claim that the structure of a merger violated the fiduciary duty owed to preferred shareholders and is of no help to plaintiffs.

On the question of fiduciary duty, we also note the following comments of Judge Pollak in denying the preliminary injunction.

"Assuming that Defendants may not, consistent with their duties, capriciously 'destroy' the market for the Natomas preferred stock or for the common stock to which it is convertible, and further assuming—without intimating—that the business reasons advanced by Defendants for the form

---

derivative action. (See *Gaillard* v. *Natomas Co., supra,* 173 Cal.App.3d 410.) In that action, although Natomas has been made a defendant, it is the real plaintiff, and it would benefit from a decree in favor of the named plaintiffs. In a shareholder's derivative action, the only benefit to the stockholder is the indirect benefit resulting from a realization upon the corporation's assets. (See *Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 107; *Gaillard* v. *Natomas Co., supra,* 173 Cal.App.3d at p. 418.)

of the proposed reorganization are not sufficient to justify the use of a form which deprives the preferred shareholders of access to a public market for their investment, the indisputable fact is that Defendants do not propose to exclude the preferred shareholders from the market. Under the Plan and Agreement of Reorganization between Diamond Shamrock Corporation and Natomas Company, the preferred shareholders will have the right, as a class, to exchange their shares of Natomas preferred stock for preferred stock of New Diamond. The New Diamond preferred unquestionably will have a public market and will be convertible into shares of New Diamond common which also will be publicly traded. Importantly, there is no suggestion that the rights, preferences and privileges attached to the New Diamond preferred shares will be more limited, or that the restrictions will be more onerous, than those which presently accompany the Natomas preferred shares. If Natomas preferred shareholders elect to exchange their shares for New Diamond preferred, they will retain their market, they will retain their preferential right to cumulative dividends in the same amount as before the merger, they will retain the right to convert to common stock at an improved ratio, and they will retain, if not improve, all of the other protections and benefits presently held by them under the Natomas Certificate of Determination. True, their right to convert will in that event be to convert into shares of a corporation controlled by different shareholders and undoubtedly by different management, but their present holdings of Natomas preferred shares do not give them the right to approve either those who own or those who manage the corporation. . . .

"Stated slightly differently, under the plan of reorganization, the Natomas preferred shareholders will be given the right either to retain their Natomas preferred shares, with the attendant possible loss or contraction of a public market, or to exchange those shares for New Diamond preferred shares bearing the same rights and privileges, which will provide an undiminished market for their shares. Whether or not providing the preferred shareholders with the first alternative without the second would have satisfied all of the fiduciary obligations owed to them, the extension of the second alternative does satisfy those obligations. If the preferred shareholders choose not to accept New Diamond preferred with the same rights, preferences, privileges and restrictions as the Natomas preferred, any diminution of marketability of their investment will be the result of their own decision."

The trial court's reasoning has recently been criticized as "too narrowly conceived an 'economic equivalence argument.'" (Buxbaum, *The Internal Division of Powers in Corporate Governance* (1985) 73 Cal.L.Rev. 1671, 1687-1692.) Professor Buxbaum argues that preferred shareholders have a legitimate interest in a transaction when it results in the addition of competing, equal claimants and suggests that courts should require preferred

shareholder participation when "structural changes would affect the preferred shareholders' status as priority claimants to residual (equity) assets." (*Id.,* at p. 1692.)

However, whatever the merits of Professor Buxbaum's theory, there is no claim in this case that plaintiffs' status as priority claimants to equity assets was diminished by the reorganization. At the hearing on the motion for summary judgment, the trial court expressly asked plaintiffs if they were arguing that the corporate assets were so depleted by the merger that the corporation was not going to be able to pay the preferred shareholders their entitlement. Plaintiffs' counsel stated that he was "not prepared to make [that] allegation." At the conclusion of the hearing, the court stated that even if one wanted to construe the complaint as making such an allegation, it had not been raised by plaintiffs in their statement on summary judgment, and that it therefore was not an issue.

## IV

When the trial court in this case ruled on the motion for summary judgment, it acknowledged the "fairness doctrine," but concluded that its application did not require defendants to obtain something more for the preferred shareholders than they were entitled to by statute or by the "governing corporate documents." The court concluded that plaintiffs were provided with the voting rights to which they were entitled under section 1201 and the certificate of determination. It also concluded that defendants' fiduciary duty to plaintiffs did not encompass the duty to negotiate for some unspecified financial benefits to which plaintiffs were not entitled by statute or the certificate of determination. We agree. Summary judgment was proper.

Judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 25, 1986.